(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## McQUIGGIN, WARDEN *v.* PERKINS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 12–126.   Argued February 25, 2013—Decided May 28, 2013

Rodney Henderson was found stabbed to death after leaving a party in Flint, Michigan, with respondent Floyd Perkins and Damarr Jones. Perkins was charged with murder.  Jones, the key prosecution witness, testified that Perkins alone committed the murder while Jones looked on.  Perkins, however, testified that Jones and Henderson left him during the evening, and that he later saw Jones with blood on his clothing.  Perkins was convicted of first-degree murder and sentenced to life in prison without the possibility of parole.  His conviction became final in 1997.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) gives a state prisoner one year to file a federal habeas petition, starting from "the date on which the judgment became final." 28 U. S. C. §2244(d)(1)(A).  But if the petition alleges newly discovered evidence, the filing deadline is one year from "the date on which the factual predicate of the claim . . . could have been discovered through . . . due diligence."  §2244(d)(1)(D).

More than 11 years after his conviction became final, Perkins filed his federal habeas petition, alleging, *inter alia*, ineffective assistance of trial counsel.  To overcome AEDPA's time limitations, he asserted newly discovered evidence of actual innocence, relying on three affidavits, the most recent dated July 16, 2002, each pointing to Jones as the murderer.  The District Court found that, even if the affidavits could be characterized as evidence newly discovered, Perkins had failed to show diligence entitling him to equitable tolling of AEDPA's limitations period.  Alternatively, the court found, Perkins had not shown that, taking account of all the evidence, no reasonable juror would have convicted him. The Sixth Circuit reversed. Acknowledging that Perkins' petition was untimely and that he had not diligently

pursued his rights, the court held that Perkins' actual-innocence claim allowed him to present his ineffective-assistance-of-counsel claim as if it had been filed on time. In so ruling, the court apparently considered Perkins' delay irrelevant to appraisal of his actual-innocence claim.

*Held*:

1. Actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* v. *Delo*, 513 U. S. 298, and *House* v. *Bell*, 547 U. S. 518, or expiration of the AEDPA statute of limitations, as in this case. Pp. 7–14.

(a) Perkins, who waited nearly six years from the date of the 2002 affidavit to file his petition, maintains that an actual-innocence plea can overcome AEDPA's one-year limitations period. This Court's decisions support his view. The Court has not resolved whether a prisoner may be entitled to habeas relief based on a freestanding actual-innocence claim, *Herrera* v. *Collins*, 506 U. S. 390, 404–405, but it has recognized that a prisoner "otherwise subject to defenses of abusive or successive use of the writ may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence," *id.*, at 404.

The Court has applied this "fundamental miscarriage of justice exception" to overcome various procedural defaults, including, as most relevant here, failure to observe state procedural rules, such as filing deadlines. See *Coleman* v. *Thompson*, 501 U. S. 722, 750. The exception, the Court's decisions bear out, survived AEDPA's passage. See*, e.g., Calderon* v. *Thompson*, 523 U. S. 538, 558; *House,* 547 U. S., at 537–538. These decisions "see[k] to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Schlup*, 513 U. S., at 324. Sensitivity to the injustice of incarcerating an innocent individual should not abate when the impediment is AEDPA's statute of limitations. Pp. 7–9.

(b) The State urges that recognition of a miscarriage of justice exception would render §2244(d)(1)(D) superfluous. That is not so, for AEDPA's time limitations apply to the typical case in which no actual-innocence claim is made, while the exception applies to a severely confined category: cases in which new evidence shows "it is more likely than not that 'no reasonable juror' would have convicted [the petitioner]," *Schlup*, 513 U. S., at 329. Many petitions that could not pass through the actual-innocence gateway will be timely or not measured by §2244(d)(1)(D)'s triggering provision. Nor does Congress' inclusion of a miscarriage of justice exception in §§2244(b)(2)(B) and 2254(e)(2) indicate an intent to preclude courts

from applying the exception in §2244(d)(1)(D) cases. Congress did not simply incorporate the miscarriage of justice exception into §§2244(b)(2)(B) and 2254(e)(2). Rather, Congress constrained the exception's application with respect to second-or-successive petitions and the holding of evidentiary hearings in federal court. The more rational inference to draw from the incorporation of a modified version of the exception into other provisions of AEDPA is that, in a case not governed by those provisions, the exception survived AEDPA's passage intact and unrestricted. Pp. 9–14.

2. A federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown. A petitioner invoking the miscarriage of justice exception "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U. S., at 327. Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing. Taking account of the delay in the context of the merits of a petitioner's actual-innocence claim, rather than treating timeliness as a threshold inquiry, is tuned to the exception's underlying rationale of ensuring "that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera*, 506 U. S., at 404. Pp. 14–16.

3. Here, the District Court's appraisal of Perkins' petition as insufficient to meet *Schlup*'s actual-innocence standard should be dispositive, absent cause, which this Court does not currently see, for the Sixth Circuit to upset that evaluation. Under *Schlup*'s demanding standard, the gateway should open only when a petition presents "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." 513 U. S., at 316. Pp. 16–17.

670 F. 3d 665, vacated and remanded.

GINSBURG, J., delivered the opinion of the Court, in which KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined, and in which ALITO, J., joined as to Parts I, II, and III.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–126

GREG McQUIGGIN, WARDEN, PETITIONER *v.* FLOYD PERKINS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[May 28, 2013]

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the "actual innocence" gateway to federal habeas review applied in *Schlup* v. *Delo*, 513 U. S. 298 (1995), and further explained in *House* v. *Bell*, 547 U. S. 518 (2006). In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. Here, the question arises in the context of 28 U. S. C. §2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996. Specifically, if the petitioner does not file her federal habeas petition, at the latest, within one year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," §2244(d)(1)(D), can the time bar be overcome by a convincing showing that she committed no crime?

We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of

limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U. S., at 329; see *House*, 547 U. S., at 538 (emphasizing that the *Schlup* standard is "demanding" and seldom met). And in making an assessment of the kind *Schlup* envisioned, "the timing of the [petition]" is a factor bearing on the "reliability of th[e] evidence" purporting to show actual innocence. *Schlup*, 513 U. S., at 332.

In the instant case, the Sixth Circuit acknowledged that habeas petitioner Perkins (respondent here) had filed his petition after the statute of limitations ran out, and had "failed to diligently pursue his rights." Order in No. 09–1875, (CA6, Feb. 24, 2010), p. 2 (Certificate of Appealability). Nevertheless, the Court of Appeals reversed the decision of the District Court denying Perkins' petition, and held that Perkins' actual-innocence claim allowed him to pursue his habeas petition as if it had been filed on time. 670 F. 3d 665, 670 (2012). The appeals court apparently considered a petitioner's delay irrelevant to appraisal of an actual-innocence claim. See *ibid.*

We vacate the Court of Appeals' judgment and remand the case. Our opinion clarifies that a federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown. See Brief for Respondent 45 (habeas court "could . . . hold the unjustified delay *against the petitioner* when making credibility findings as to whether the [actual-innocence] exception has been met").

# I

## A

On March 4, 1993, respondent Floyd Perkins attended a party in Flint, Michigan, in the company of his friend, Rodney Henderson, and an acquaintance, Damarr Jones. The three men left the party together. Henderson was later discovered on a wooded trail, murdered by stab wounds to his head.

Perkins was charged with the murder of Henderson. At trial, Jones was the key witness for the prosecution. He testified that Perkins alone committed the murder while Jones looked on. App. 55.

Chauncey Vaughn, a friend of Perkins and Henderson, testified that, prior to the murder, Perkins had told him he would kill Henderson, *id.*, at 39, and that Perkins later called Vaughn, confessing to his commission of the crime. *Id.*, at 36–38. A third witness, Torriano Player, also a friend of both Perkins and Henderson, testified that Perkins told him, had he known how Player felt about Henderson, he would not have killed Henderson. *Id.*, at 74.

Perkins, testifying in his own defense, offered a different account of the episode. He testified that he left Henderson and Jones to purchase cigarettes at a convenience store. When he exited the store, Perkins related, Jones and Henderson were gone. *Id.*, at 84. Perkins said that he then visited his girlfriend. *Id.*, at 87. About an hour later, Perkins recalled, he saw Jones standing under a streetlight with blood on his pants, shoes, and plaid coat. *Id.*, at 90.

The jury convicted Perkins of first-degree murder. He was sentenced to life in prison without the possibility of parole on October 27, 1993. The Michigan Court of Appeals affirmed Perkins' conviction and sentence, and the Michigan Supreme Court denied Perkins leave to appeal on January 31, 1997. Perkins' conviction became final on May 5, 1997.

## B

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, a state prisoner ordinarily has one year to file a federal petition for habeas corpus, starting from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U. S. C. §2244(d)(1)(A). If the petition alleges newly discovered evidence, however, the filing deadline is one year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." §2244(d)(1)(D).

Perkins filed his federal habeas corpus petition on June 13, 2008, more than 11 years after his conviction became final. He alleged, *inter alia*, ineffective assistance on the part of his trial attorney, depriving him of his Sixth Amendment right to competent counsel. To overcome AEDPA's time limitations, Perkins asserted newly discovered evidence of actual innocence. He relied on three affidavits, each pointing to Jones, not Perkins, as Henderson's murderer.

The first affidavit, dated January 30, 1997, was submitted by Perkins' sister, Ronda Hudson. Hudson stated that she had heard from a third party, Louis Ford, that Jones bragged about stabbing Henderson and had taken his clothes to the cleaners after the murder. App. to Pet. for Cert. 54a–55a. The second affidavit, dated March 16, 1999, was subscribed to by Demond Louis, Chauncey Vaughn's younger brother. Louis stated that, on the night of the murder, Jones confessed to him that he had just killed Henderson. Louis also described the clothes Jones wore that night, bloodstained orange shoes and orange pants, and a colorful shirt. *Id.*, at 50a–53a. The next day, Louis added, he accompanied Jones, first to a dumpster where Jones disposed of the bloodstained shoes, and then to the cleaners. Finally, Perkins presented the July 16,

2002 affidavit of Linda Fleming, an employee at Pro-Clean Cleaners in 1993. She stated that, on or about March 4, 1993, a man matching Jones's description entered the shop and asked her whether bloodstains could be removed from the pants and a shirt he brought in. The pants were orange, she recalled, and heavily stained with blood, as was the multicolored shirt left for cleaning along with the pants. *Id.*, at 48a–49a.

The District Court found the affidavits insufficient to entitle Perkins to habeas relief. Characterizing the affidavits as newly discovered evidence was "dubious," the District Court observed, in light of what Perkins knew about the underlying facts at the time of trial. *Id.*, at 29a. But even assuming qualification of the affidavits as evidence newly discovered, the District Court next explained, "[Perkins'] petition [was] untimely under §2244(d)(1)(D)." *Ibid.* "[If] the statute of limitations began to run as of the date of the latest of th[e] affidavits, July 16, 2002," the District Court noted, then "absent tolling, [Perkins] had until July 16, 2003 in which to file his habeas petition." *Ibid.* Perkins, however, did not file until nearly five years later, on June 13, 2008.

Under Sixth Circuit precedent, the District Court stated, "a habeas petitioner who demonstrates a credible claim of actual innocence based on new evidence may, in exceptional circumstances, be entitled to equitable tolling of habeas limitations." *Id.*, at 30a. But Perkins had not established exceptional circumstances, the District Court determined. In any event, the District Court observed, equitable tolling requires diligence and Perkins "ha[d] failed utterly to demonstrate the necessary diligence in exercising his rights." *Id.*, at 31a. Alternatively, the District Court found that Perkins had failed to meet the strict standard by which pleas of actual innocence are measured: He had not shown that, taking account of all the evidence, "it is more likely than not that no reasonable

juror would have convicted him," or even that the evidence was new. *Id.*, at 30a–31a.

Perkins appealed the District Court's judgment. Although recognizing that AEDPA's statute of limitations had expired and that Perkins had not diligently pursued his rights, the Sixth Circuit granted a certificate of appealability limited to a single question: Is reasonable diligence a precondition to relying on actual innocence as a gateway to adjudication of a federal habeas petition on the merits? Certificate of Appealability 2–3.

On consideration of the certified question, the Court of Appeals reversed the District Court's judgment. Adhering to Circuit precedent, *Souter* v. *Jones*, 395 F. 3d 577, 597–602 (2005), the Sixth Circuit held that Perkins' gateway actual-innocence allegations allowed him to present his ineffective-assistance-of-counsel claim as if it were filed on time. On remand, the Court of Appeals instructed, "the [D]istrict [C]ourt [should] fully consider whether Perkins assert[ed] a credible claim of actual innocence." 670 F. 3d, at 676.

We granted certiorari to resolve a Circuit conflict on whether AEDPA's statute of limitations can be overcome by a showing of actual innocence. 568 U. S. ___ (2012). Compare, *e.g., San Martin* v. *McNeil*, 633 F. 3d 1257, 1267–1268 (CA11 2011) ("A court . . . may consider an untimely §2254 petition if, by refusing to consider the petition for untimeliness, the court thereby would endorse a 'fundamental miscarriage of justice' because it would require that an individual who is actually innocent remain imprisoned."), with, *e.g.*, *Escamilla* v. *Jungwirth*, 426 F. 3d 868, 871–872 (CA7 2005) ("Prisoners claiming to be innocent, like those contending that other events spoil the conviction, must meet the statutory requirement of timely action."). See also *Rivas* v. *Fischer*, 687 F. 3d 514, 548 (CA2 2012) (collecting cases).

## II
### A

In *Holland* v. *Florida*, 560 U. S. \_\_\_ (2010), this Court addressed the circumstances in which a federal habeas petitioner could invoke the doctrine of "equitable tolling." *Holland* held that "a [habeas] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.*, at \_\_\_ (slip op., at 16–17) (internal quotation marks omitted). As the courts below comprehended, Perkins does not qualify for equitable tolling. In possession of all three affidavits by July 2002, he waited nearly six years to seek federal postconviction relief. "Such a delay falls far short of demonstrating the . . . diligence" required to entitle a petitioner to equitable tolling. App. to Pet. for Cert. 31a (District Court opinion). See also Certificate of Appealability 2.

Perkins, however, asserts not an excuse for filing after the statute of limitations has run. Instead, he maintains that a plea of actual innocence can overcome AEDPA's one-year statute of limitations. He thus seeks an equitable *exception* to §2244(d)(1), not an extension of the time statutorily prescribed. See *Rivas*, 687 F. 3d, at 547, n. 42 (distinguishing from "equitable tolling" a plea to override the statute of limitations when actual innocence is shown).

Decisions of this Court support Perkins' view of the significance of a convincing actual-innocence claim. We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence. *Herrera* v. *Collins*, 506 U. S. 390, 404–405 (1993). We have recognized, however, that a prisoner "otherwise subject to defenses of abusive or successive use of the writ [of habeas corpus] may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence." *Id.*, at 404 (citing

*Sawyer* v. *Whitley*, 505 U. S. 333 (1992)). See also *Murray* v. *Carrier*, 477 U. S. 478, 496 (1986) ("[W]e think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."). In other words, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief. "This rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera*, 506 U. S., at 404.

We have applied the miscarriage of justice exception to overcome various procedural defaults. These include "successive" petitions asserting previously rejected claims, see *Kuhlmann* v. *Wilson*, 477 U. S. 436, 454 (1986) (plurality opinion), "abusive" petitions asserting in a second petition claims that could have been raised in a first petition, see *McCleskey* v. *Zant*, 499 U. S. 467, 494–495 (1991), failure to develop facts in state court, see *Keeney* v. *Tamayo-Reyes*, 504 U. S. 1, 11–12 (1992), and failure to observe state procedural rules, including filing deadlines, see *Coleman* v. *Thompson*, 501 U. S. 722, 750 (1991); *Carrier*, 477 U. S., at 495–496.

The miscarriage of justice exception, our decisions bear out, survived AEDPA's passage. In *Calderon* v. *Thompson*, 523 U. S. 538 (1998), we applied the exception to hold that a federal court may, consistent with AEDPA, recall its mandate in order to revisit the merits of a decision. *Id.*, at 558 ("The miscarriage of justice standard is altogether consistent . . . with AEDPA's central concern that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual inno-

cence."). In *Bousley* v. *United States*, 523 U. S. 614, 622 (1998), we held, in the context of §2255, that actual innocence may overcome a prisoner's failure to raise a constitutional objection on direct review. Most recently, in *House*, we reiterated that a prisoner's proof of actual innocence may provide a gateway for federal habeas review of a procedurally defaulted claim of constitutional error. 547 U. S., at 537–538.

These decisions "see[k] to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Schlup*, 513 U. S., at 324. Sensitivity to the injustice of incarcerating an innocent individual should not abate when the impediment is AEDPA's statute of limitations.

As just noted, see *supra,* at 8, we have held that the miscarriage of justice exception applies to state procedural rules, including filing deadlines. *Coleman*, 501 U. S., at 750. A federal court may invoke the miscarriage of justice exception to justify consideration of claims defaulted in state court under state timeliness rules. See *ibid.* The State's reading of AEDPA's time prescription would thus accord greater force to a federal deadline than to a similarly designed state deadline. It would be passing strange to interpret a statute seeking to promote federalism and comity as requiring stricter enforcement of federal procedural rules than procedural rules established and enforced by the *States*.

### B

The State ties to §2244(d)'s text its insistence that AEDPA's statute of limitations precludes courts from considering late-filed actual-innocence gateway claims. "Section 2244(d)(1)(D)," the State contends, "forecloses any argument that a habeas petitioner has unlimited time to present new evidence in support of a constitutional claim."

Brief for Petitioner 17. That is so, the State maintains, because AEDPA prescribes a comprehensive system for determining when its one-year limitations period begins to run. "Included within that system," the State observes, "is a specific trigger for the precise circumstance presented here: a constitutional claim based on new evidence." *Ibid.* Section 2244(d)(1)(D) runs the clock from "the date on which the factual predicate of the claim . . . could have been discovered through the exercise of due diligence." In light of that provision, the State urges, "there is no need for the courts to act in equity to provide additional time for persons who allege actual innocence as a gateway to their claims of constitutional error." *Ibid.* Perkins' request for an equitable exception to the statute of limitations, the State charges, would "rende[r] superfluous this carefully scripted scheme." *Id.*, at 18.

The State's argument in this regard bears blinders. AEDPA's time limitations apply to the typical case in which no allegation of actual innocence is made. The miscarriage of justice exception, we underscore, applies to a severely confined category: cases in which new evidence shows "it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Schlup*, 513 U. S., at 329 (internal quotation marks omitted). Section 2244(d)(1)(D) is both modestly more stringent (because it requires diligence) and dramatically less stringent (because it requires no showing of innocence). Many petitions that could not pass through the actual-innocence gateway will be timely or not measured by §2244(d)(1)(D)'s triggering provision. That provision, in short, will hardly be rendered superfluous by recognition of the miscarriage of justice exception.

The State further relies on provisions of AEDPA other than §2244(d)(1)(D), namely, §§2244(b)(2)(B) and 2254(e)(2), to urge that Congress knew how to incorporate the miscarriage of justice exception when it was so minded.

Section 2244(b)(2)(B), the State observes, provides that a petitioner whose first federal habeas petition has already been adjudicated when new evidence comes to light may file a second-or-successive petition when, and only when, the facts underlying the new claim would "establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." §2244(b)(2)(B)(ii).  And §2254(e)(2), which generally bars evidentiary hearings in federal habeas proceedings initiated by state prisoners, includes an exception for prisoners who present new evidence of their innocence.  See §§2254(e)(2)(A)(ii), (B) (permitting evidentiary hearings in federal court if "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense").

But Congress did not simply incorporate the miscarriage of justice exception into §§2244(b)(2)(B) and 2254(e)(2). Rather, Congress constrained the application of the exception.  Prior to AEDPA's enactment, a court could grant relief on a second-or-successive petition, then known as an "abusive" petition, if the petitioner could show that "a fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey*, 499 U. S., at 495.  Section 2244(b)(2)(B) limits the exception to cases in which "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," and the petitioner can establish that no reasonable factfinder "would have found [her] guilty of the underlying offense" by "clear and convincing evidence." Congress thus required second-or-successive habeas petitioners attempting to benefit from the miscarriage of justice exception to meet a higher level of proof ("clear and convincing evidence") and to satisfy a diligence require-

ment that did not exist prior to AEDPA's passage.

Likewise, petitioners asserting actual innocence pre-AEDPA could obtain evidentiary hearings in federal court even if they failed to develop facts in state court. See *Keeney*, 504 U. S., at 12 ("A habeas petitioner's failure to develop a claim in state-court proceedings will be excused and a hearing mandated if he can show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing."). Under AEDPA, a petitioner seeking an evidentiary hearing must show diligence and, in addition, establish her actual innocence by clear and convincing evidence. §§2254(e)(2)(A)(ii), (B).

Sections 2244(b)(2)(B) and 2254(e)(2) thus reflect Congress' will to *modify* the miscarriage of justice exception with respect to second-or-successive petitions and the holding of evidentiary hearings in federal court. These provisions do not demonstrate Congress' intent to preclude courts from applying the exception, unmodified, to "the type of petition at issue here"—an untimely first federal habeas petition alleging a gateway actual-innocence claim. *House*, 547 U. S., at 539.[1] The more rational inference to draw from Congress' incorporation of a modified version of the miscarriage of justice exception in §§2244(b)(2)(B) and

---

[1] In *House*, we rejected the analogous argument that AEDPA replaced the standard for actual-innocence gateway claims prescribed in *Schlup* v. *Delo*, 513 U. S. 298, 327 (1995) (petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence"), with a "clear and convincing" evidence requirement. 547 U. S., at 539 (internal quotation marks omitted). As here, the State relied on §§2244(b)(2)(B)(ii) and 2254(e)(2) to support its argument. But "[n]either provision address[ed] the type of petition at issue . . . [,] a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence." *Ibid.* Consequently, we held inapplicable to first petitions the stricter standard AEDPA prescribed for second-or-successive petitions. *Ibid.*

2254(e)(2) is simply this: In a case not governed by those provisions, *i.e.*, a first petition for federal habeas relief, the miscarriage of justice exception survived AEDPA's passage intact and unrestricted.[2]

Our reading of the statute is supported by the Court's opinion in *Holland.* "[E]quitable principles have traditionally governed the substantive law of habeas corpus," *Holland* reminded, and affirmed that "we will not construe a statute to displace courts' traditional equitable authority absent the clearest command." 560 U. S., at \_\_\_ (slip op., at 13) (internal quotation marks omitted). The text of §2244(d)(1) contains no clear command countering the courts' equitable authority to invoke the miscarriage of justice exception to overcome expiration of the statute of limitations governing a first federal habeas petition. As we observed in *Holland,*

"AEDPA seeks to eliminate delays in the federal habeas review process. But AEDPA seeks to do so without undermining basic habeas corpus principles and while seeking to harmonize the new statute with prior law . . . . When Congress codified new rules governing this previously judicially managed area of law, it did so without losing sight of the fact that the writ of habeas corpus plays a vital role in protecting constitutional rights." *Id.*, at \_\_\_ (slip op., at 16) (citations

———————————

[2] Prior to AEDPA, it is true, this Court had not ruled that a credible claim of actual innocence could supersede a federal statute of limitations. The reason why that is so is evident: Pre-AEDPA, petitions for federal habeas relief were not governed by any statute of limitations. Notably, we said in *Coleman* v. *Thompson*, 501 U. S. 722 (1991), that a petitioner who failed to comply with a timeliness requirement in *state* court could nevertheless plead her claims on the merits in federal court if she could show that "failure to consider the claims [would] result in a fundamental miscarriage of justice." *Id.*, at 750.

and internal quotation marks omitted).[3]

### III

Having rejected the State's argument that §2244(d)(1)(D) precludes a court from entertaining an untimely first federal habeas petition raising a convincing claim of actual innocence, we turn to the State's further objection to the Sixth Circuit's opinion. Even if a habeas petitioner asserting a credible claim of actual innocence may overcome AEDPA's statute of limitations, the State argues, the Court of Appeals erred in finding that no threshold diligence requirement at all applies to Perkins' petition.

While formally distinct from its argument that §2244(d)(1)(D)'s text forecloses a late-filed claim alleging actual innocence, the State's contention makes scant sense. Section 2244(d)(1)(D) requires a habeas petitioner to file a claim within one year of the time in which new evidence "could have been discovered through the exercise of due diligence." It would be bizarre to hold that a habeas

---

[3] For eight pages, the dissent stridently insists that federal (although not state) statutes of limitations allow no exceptions not contained in the text. Well, not quite so, the dissent ultimately acknowledges. *Post*, at 8. Even AEDPA's statute of limitations, the dissent admits, is subject to equitable tolling. But that is because equitable tolling "can be seen as a reasonable assumption of genuine legislative intent." *Post*, at 9. Why is it not an equally reasonable assumption that Congress would want a limitations period to yield when what is at stake is a State's incarceration of an individual for a crime, it has become clear, no reasonable person would find he committed? For all its bluster, the dissent agrees with the Court on a crucial point: Congress legislates against the backdrop of existing law. *Post*, at 10. At the time of AEDPA's enactment, multiple decisions of this Court applied the miscarriage of justice exception to overcome various threshold barriers to relief. See *supra*, at 7–9. It is hardly "unprecedented," therefore, to conclude that "Congress intended or could have anticipated [a miscarriage of justice] exception" when it enacted AEDPA. *Post*, at 10–11.

petitioner who asserts a convincing claim of actual inno-
cence may overcome the statutory time bar §2244(d)(1)(D)
erects, yet simultaneously encounter a court-fashioned
diligence barrier to pursuit of her petition. See 670 F. 3d,
at 673 ("Requiring reasonable diligence effectively makes
the concept of the actual innocence gateway redundant,
since petitioners . . . seek [an equitable exception only]
when they were not reasonably diligent in complying with
§2244(d)(1)(D).").

While we reject the State's argument that habeas peti-
tioners who assert convincing actual-innocence claims
must prove diligence to cross a federal court's threshold,
we hold that the Sixth Circuit erred to the extent that
it eliminated timing as a factor relevant in evaluating the
reliability of a petitioner's proof of innocence. To invoke
the miscarriage of justice exception to AEDPA's statute of
limitations, we repeat, a petitioner "must show that it is
more likely than not that no reasonable juror would have
convicted him in the light of the new evidence." *Schlup*,
513 U. S., at 327. Unexplained delay in presenting new
evidence bears on the determination whether the petitioner
has made the requisite showing. Perkins so acknowl-
edges. See Brief for Respondent 52 (unjustified delay may
figure in determining "whether a petitioner has made a
sufficient showing of innocence"). As we stated in *Schlup*,
"[a] court may consider how the timing of the submission
and the likely credibility of [a petitioner's] affiants bear on
the probable reliability of . . . evidence [of actual inno-
cence]." 513 U. S., at 332. See also *House*, 547 U. S., at
537.

Considering a petitioner's diligence, not discretely, but
as part of the assessment whether actual innocence has
been convincingly shown, attends to the State's concern
that it will be prejudiced by a prisoner's untoward delay in
proffering new evidence. The State fears that a prisoner
might "lie in wait and use stale evidence to collaterally

attack his conviction . . . when an elderly witness has died
and cannot appear at a hearing to rebut new evidence."
Brief for Petitioner 25. The timing of such a petition,
however, should seriously undermine the credibility of the
actual-innocence claim. Moreover, the deceased witness'
prior testimony, which would have been subject to cross-
examination, could be introduced in the event of a new
trial. See *Crawford* v. *Washington*, 541 U. S. 36, 53–54
(2004) (recognizing exception to the Confrontation Clause
where witness is unavailable and the defendant had a
prior opportunity for cross-examination). And frivolous
petitions should occasion instant dismissal. See 28
U. S. C. §2254 Rule 4. Focusing on the merits of a peti-
tioner's actual-innocence claim and taking account of
delay in that context, rather than treating timeliness as a
threshold inquiry, is tuned to the rationale underlying the
miscarriage of justice exception—*i.e.*, ensuring "that fed-
eral constitutional errors do not result in the incarceration
of innocent persons." *Herrera*, 506 U. S., at 404.[4]

## IV

We now return to the case at hand. The District Court
proceeded properly in first determining that Perkins'
claim was filed well beyond AEDPA's limitations period
and that equitable tolling was unavailable to Perkins
because he could demonstrate neither exceptional circum-
stances nor diligence. See *supra,* at 5. The District Court
then found that Perkins' alleged newly discovered evi-
dence, *i.e.*, the information contained in the three affida-
vits, was "substantially available to [Perkins] at trial."

---

[4] We note one caveat: A showing that delay was part of a deliberate
attempt to manipulate the case, say by waiting until a key prosecution
witness died or was deported, might raise a different ground for with-
holding equitable relief. No such contention was presented here,
however, so we do not discuss the point.

App. to Pet. for Cert. 31a. Moreover, the proffered evidence, even if "new," was hardly adequate to show that, had it been presented at trial, no reasonable juror would have convicted Perkins. *Id.*, at 30a–31a.

The Sixth Circuit granted a certificate of appealability limited to the question whether reasonable diligence is a precondition to reliance on actual innocence as a gateway to adjudication of a federal habeas petition on the merits. We have explained that untimeliness, although not an unyielding ground for dismissal of a petition, does bear on the credibility of evidence proffered to show actual innocence. On remand, the District Court's appraisal of Perkins' petition as insufficient to meet *Schlup*'s actual-innocence standard should be dispositive, absent cause, which we do not currently see, for the Sixth Circuit to upset that evaluation. We stress once again that the *Schlup* standard is demanding. The gateway should open only when a petition presents "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." 513 U. S., at 316.

*          *          *

For the reasons stated, the judgment of the Sixth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 12–126

GREG McQUIGGIN, WARDEN, PETITIONER *v.* FLOYD
PERKINS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 28, 2013]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and
JUSTICE THOMAS join, and with whom JUSTICE ALITO joins
as to Parts I, II, and III, dissenting.

The Antiterrorism and Effective Death Penalty Act of
1996 (AEDPA) provides that a "1-year period of limitation
shall apply" to a state prisoner's application for a writ of
habeas corpus in federal court.  28 U. S. C. §2244(d)(1).
The gaping hole in today's opinion for the Court is its
failure to answer the crucial question upon which all else
depends: What is the source of the Court's power to fash-
ion what it concedes is an "exception" to this clear statu-
tory command?

That question is unanswered because there is no an-
swer.  This Court has no such power, and not one of the
cases cited by the opinion says otherwise.  The Constitu-
tion vests legislative power only in Congress, which never
enacted the exception the Court creates today.  That in-
convenient truth resolves this case.

I

A

"Actual innocence" has, until today, been an exception
only to judge-made, prudential barriers to habeas relief, or
as a means of channeling judges' statutorily conferred
discretion not to apply a procedural bar.  Never before

have we applied the exception to circumvent a categorical *statutory* bar to relief. We have not done so because we have no power to do so. Where Congress has erected a constitutionally valid barrier to habeas relief, a court *cannot* decline to give it effect.

Before AEDPA, the Supreme Court had developed an array of doctrines, see, *e.g., Wainwright* v. *Sykes*, 433 U. S. 72, 87 (1977) (procedural default); *McCleskey* v. *Zant*, 499 U. S. 467, 489 (1991) (abuse of the writ), to limit the habeas practice that it had radically expanded in the early or mid-20th century to include review of the merits of conviction and not merely jurisdiction of the convicting court, see *Stone* v. *Powell*, 428 U. S. 465, 475–478 (1976) (citing *Frank* v. *Mangum*, 237 U. S. 309 (1915)); *Brown* v. *Allen*, 344 U. S. 443, 533–534 (1953) (Jackson, J., concurring in result); Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 483–499 (1963). For example, the doctrine of procedural default holds that a state prisoner's default of his federal claims "in state court pursuant to an independent and adequate state procedural rule" bars federal habeas review of those claims. *Coleman* v. *Thompson*, 501 U. S. 722, 750 (1991). That doctrine is not a statutory or jurisdictional command; rather, it is a "prudential" rule "grounded in 'considerations of comity and concerns for the orderly administration of criminal justice.'" *Dretke* v. *Haley*, 541 U. S. 386, 392–393 (2004) (quoting *Francis* v. *Henderson*, 425 U. S. 536, 538–539 (1976)).

And what courts have created, courts can modify. One judge-made exception to procedural default allows a petitioner to proceed where he can demonstrate "cause" for the default and "prejudice." See *Coleman, supra,* at 750. As relevant here, we have also expressed a willingness to excuse a petitioner's default, even absent a showing of cause, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent."

*Murray* v. *Carrier*, 477 U. S. 478, 496 (1986); see *Schlup* v. *Delo*, 513 U. S. 298, 326–327 (1995); *House* v. *Bell*, 547 U. S. 518, 536–537 (2006).

There is nothing inherently inappropriate (as opposed to merely unwise) about judge-created exceptions to judge-made barriers to relief. Procedural default, for example, raises "no question of a federal district court's power to entertain an application for a writ of habeas corpus." *Francis*, *supra,* at 538. Where a petitioner would, but for a judge-made doctrine like procedural default, have a good habeas claim, it offends no command of Congress's for a federal court to consider the petition. But that free-and-easy approach has no place where a statutory bar to habeas relief is at issue. "[T]he power to award the writ by any of the courts of the United States, must be given by written law," *Ex parte Bollman*, 4 Cranch 75, 94 (1807) (Marshall, C. J.), and "judgments about the proper scope of the writ are 'normally for Congress to make,'" *Felker* v. *Turpin*, 518 U. S. 651, 664 (1996) (quoting *Lonchar* v. *Thomas*, 517 U. S. 314, 323 (1996)). One would have thought it too obvious to mention that this Court is duty bound to enforce AEDPA, not amend it.

## B

Because we have no "equitable" power to discard statutory barriers to habeas relief, we cannot simply extend judge-made exceptions to judge-made barriers into the statutory realm. The Court's insupportable leap from judge-made procedural bars to *all* procedural bars, including *statutory* bars, does all the work in its opinion—and there is not a whit of precedential support for it. *McCleskey* v. *Zant* applied a "miscarriage of justice" exception to the judge-made abuse-of-the-writ doctrine. 499 U. S., at 487–489, 495. *Coleman* v. *Thompson* and *Murray* v. *Carrier* applied it to the judge-made procedural-default doctrine. 501 U. S., at 750; 477 U. S., at 496. *Keeney* v.

*Tamayo-Reyes*, 504 U. S. 1 (1992), applied it to a variant of procedural default: a state prisoner's failure adequately to develop material facts in state court. *Id.,* at 8. *Kuhlmann* v. *Wilson*, 477 U. S. 436 (1986), a plurality opinion, applied it to a statute that merely said lower federal courts "need not" entertain successive petitions, thus leaving them with "*discretion* to entertain successive petitions under some circumstances." *Id.,* at 449, 451 (emphasis added). Not one of the cases on which the Court relies today supports the extraordinary premise that courts can create out of whole cloth an exception to a statutory bar to relief.

The opinion for the Court also trots out post-AEDPA cases to prove the irrelevant point that "[t]he miscarriage of justice exception . . . survived AEDPA's passage." *Ante,* at 8. What it ignores, yet again, is that after AEDPA's passage, as before, the exception applied only to *nonstatutory* obstacles to relief. *Bousley* v. *United States* and *House* v. *Bell* were applications of the judge-made doctrine of procedural default. See *Bousley,* 523 U. S. 614, 623 (1998); *id.,* at 625 (Stevens, J., concurring in part and dissenting in part) ("I agree with the Court's central holding . . . that none of its *judge-made rules* foreclose petitioner's collateral attack . . ." (emphasis added)); *id.,* at 630 (SCALIA, J., dissenting); *House,* 547 U. S., at 522. *Calderon* v. *Thompson*, 523 U. S. 538 (1998), a non-AEDPA case, involved the courts of appeals' "inherent power to recall their mandates, subject to review for an abuse of discretion," *id.,* at 549; it stands only for the proposition that the miscarriage-of-justice exception is an appropriate "'means of channeling'" that discretion, *id.,* at 559 (quoting *McCleskey, supra,* at 496).

The Court's opinion, in its way, acknowledges the dearth of precedential support for its holding. "Prior to AEDPA," it concedes, "this Court had not ruled that a credible claim of actual innocence could supersede a federal statute of

limitations." *Ante,* at 13, n. 2. Its explanation for this lack of precedent is that before AEDPA, "petitions for federal habeas relief were not governed by any statute of limitations." *Ibid.* That is true but utterly unprobative. There are many statutory bars to relief other than statutes of limitations, and we had never (and before today, have never) created an actual-innocence exception to *any* of them. The reason why is obvious: Judicially amending a validly enacted statute in this way is a flagrant breach of the separation of powers.

## II

The Court has no qualms about transgressing such a basic principle. It does not even attempt to cloak its act of judicial legislation in the pretense that it is merely construing the statute; indeed, it freely admits that its opinion recognizes an "exception" that the statute does not contain. *Ante*, at 7. And it dismisses, with a series of transparent non sequiturs, Michigan's overwhelming textual argument that the statute provides no such exception and envisions none.

The key textual point is that two provisions of §2244, working in tandem, provide a comprehensive path to relief for an innocent prisoner who has newly discovered evidence that supports his constitutional claim. Section 2244(d)(1)(D) gives him a fresh year in which to file, starting on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," while §2244(b)(2)(B) lifts the bar on second or successive petitions. Congress clearly anticipated the scenario of a habeas petitioner with a credible innocence claim and addressed it by crafting an exception (and an exception, by the way, more restrictive than the one that pleases the Court today). One cannot assume that Congress left room for other, judge-made applications of the actual-innocence exception, any more

than one would add another gear to a Swiss watch on the theory that the watchmaker surely would have included it if he had thought of it. In both cases, the intricate crafts-manship tells us that the designer arranged things just as he wanted them.

The Court's feeble rejoinder is that its (judicially in-vented) version of the "actual innocence" exception applies only to a "severely confined category" of cases. *Ante*, at 10. Since cases qualifying for the actual-innocence exception will be rare, it explains, the statutory path for innocent petitioners will not "be rendered superfluous." *Ibid.* That is no answer at all. That the Court's exception would not *entirely* frustrate Congress's design does not weaken the force of the State's argument that Congress addressed the issue comprehensively and chose to exclude dilatory prisoners like respondent. By the Court's logic, a statute banning littering could simply be deemed to contain an exception for cigarette butts; after all, the statute as thus amended would still cover *something*. That is not how a court respectful of the separation of powers should inter-pret statutes.

Even more bizarre is the Court's concern that applying AEDPA's statute of limitations without recognizing an atextual actual-innocence exception would "accord greater force to a federal deadline than to a similarly designed state deadline." *Ante,* at 9; see also *ante,* at 13, n. 2. The Court terms that outcome "passing strange," *ante,* at 9, but it is not strange at all. Only *federal* statutes of limita-tions bind federal habeas courts with the force of law; a state statute of limitations is given effect on federal habeas review only by virtue of the *judge-made* doctrine of procedural default.[1] See *Coleman,* 501 U. S., at 730–731.

—————

[1] If the Court is really troubled by this disparity, there is a way to resolve it that is consistent with the separation of powers: Revise our judge-made procedural-default doctrine to give absolute preclusive

With its eye firmly fixed on something it likes—a shiny new exception to a statute unloved in the best circles—the Court overlooks this basic distinction, which would not trouble a second-year law student armed with a copy of Hart & Wechsler. The Court simply ignores basic legal principles where they pose an obstacle to its policy-driven, free-form improvisation.

The Court's statutory-construction blooper reel does not end there. Congress's express inclusion of innocence-based exceptions in two neighboring provisions of the Act confirms, one would think, that there is no actual-innocence exception to §2244(d)(1). Section 2244(b)(2)(B), as already noted, lifts the bar on claims presented in second or successive petitions where "the factual predicate for the claim could not have been discovered previously through . . . due diligence" and "the facts underlying the claim . . . would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found" the petitioner guilty. Section 2254(e)(2) permits a district court to hold an evidentiary hearing where a diligent state prisoner's claim relies on new facts that "would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found" him guilty. Ordinarily, we would draw from the express enumeration of these two actual-innocence exceptions the inference that no others were intended.

The Court's twisting path to the contrary conclusion is not easy to follow, but I will try. In the Court's view, the key fact here is that these two provisions of AEDPA codified what had previously been judge-made barriers to relief and applied to them a stricter actual-innocence standard than the courts had been applying. See *ante,* at 11–12. From this, the Court reasons that Congress made

———————

effect to state statutes of limitations.

a conscious choice not also to apply the more restrictive
actual-innocence standard to the statute of limitations.
Ergo, the Court concludes, we are free to apply the more
lenient version of the actual-innocence exception. *Ante,* at
12–13.   That clever account ignores the background
against which Congress legislated. *Of course* Congress did
not "constrain" application of the actual-innocence excep-
tion to the statute of limitations.  It felt no need to do so,
because it had no reason whatsoever to suspect that *any*
version of the exception would *apply* to the statute of
limitations.  The collective efforts of respondent and the
majority have turned up not a single instance where this
Court has applied the actual-innocence exception to *any*
statutory barrier to habeas relief, much less to a statute of
limitations.  See Part I–B, *supra.*  What has been said
of equitable tolling applies in spades to non-tolling judi-
cial inventions: "Congress cannot intend to incorporate, by
silence, various forms of equitable tolling that were not
generally recognized in the common law at the time of
enactment."  Bain & Colella, Interpreting Federal Statutes
of Limitations, 37 Creighton L. Rev. 493, 503 (2004).
The only conceivable relevance of §§2244(b)(2)(B) and
2254(e)(2) is (1) as we have said, that no other actual-
innocence exception was intended, and (2) that *if* Congress
had anticipated that this Court would amend §2244(d)(1)
to add an actual-innocence exception (which it surely did
not), it would have desired the more stringent formulation
and not the expansive formulation applied today, which it
specifically rejected for those other provisions.

### III

Three years ago, in *Holland* v. *Florida*, 560 U. S. ___
(2010), we held that AEDPA's statute of limitations is
subject to equitable tolling.  That holding offers no support
for importing a novel actual-innocence exception.  Equit-
able tolling—extending the deadline for a filing because of

an event or circumstance that deprives the filer, through no fault of his own, of the full period accorded by the statute—seeks to vindicate what might be considered the genuine intent of the statute. By contrast, suspending the statute because of a separate policy that the court believes should trump it ("actual innocence") is a blatant overruling. Moreover, the doctrine of equitable tolling is centuries old, and dates from a time when the separation of the legislative and judicial powers was incomplete. See, *e.g., Bree* v. *Holbech*, 2 Doug. 655, 656 (1781) (Mansfield, J.); *South-Sea Co.* v. *Wymondsell*, 24 E. R. 1004, 3 P. Wms. 143, 144 (1732); *Booth* v. *Warrington*, 2 E. R. 111, 112–113, 4 Bro. P. C. 163, 165–166 (1714); see also *Holmberg* v. *Armbrecht*, 327 U. S. 392, 396–397 (1946); *Exploration Co.* v. *United States*, 247 U. S. 435, 446–447 (1918); *Bailey* v. *Glover*, 21 Wall. 342, 348 (1875); *Sherwood* v. *Sutton*, 21 F. Cas. 1303, 1304–1305 (No. 12,782) (CCNH 1828) (Story, J.); *Jones* v. *Conoway*, 4 Yeates 109 (Pa. 1804). As Professor Manning has explained, until the Glorious Revolution of 1688, the Crown retained "pretensions to independent legislative authority, and English judges continued to serve as the Crown's agents, in theory and practice a component of the executive. Given these conditions, which distinguish the old English from the American constitutional context, it is not surprising to find a similarly indistinct line between appropriate legislative and judicial functions in matters of interpretation." Manning, Textualism and the Equity of the Statute, 101 Colum. L. Rev. 1, 36–37 (2001) (footnote omitted). Thus, the doctrine of the equity of the statute, of which equitable tolling was an example, was reflected in Blackstone's Commentaries "two-thirds of the way through the eighteenth century." Manning, *supra,* at 52.

American courts' later adoption of the English equitable-tolling practice need not be regarded as a violation of the separation of powers, but can be seen as a reasonable

assumption of genuine legislative intent. Colonial legislatures would have assumed that equitable tolling would attend any statute of limitations they adopted. In any case, equitable tolling surely represents such a reasonable assumption today. "It is hornbook law that limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute. Congress must be presumed to draft limitations periods in light of this background principle." *Young* v. *United States*, 535 U. S. 43, 49–50 (2002) (internal quotation marks and citations omitted); see Manning, What Divides Textualists from Purposivists? 106 Colum. L. Rev. 70, 81–82, and n. 42 (2006). Congress, being well aware of the longstanding background presumption of equitable tolling, "may provide otherwise if it wishes to do so." *Irwin* v. *Department of Veterans Affairs*, 498 U. S. 89, 96 (1990). The majority and dissenting opinions in *Holland* disputed whether that presumption had been overcome, but all agreed that the presumption existed and was a legitimate tool for construing statutes of limitations. See *Holland,* 560 U. S., at ___ (slip op., at 13); *id.,* at ___ (SCALIA, J., dissenting) (slip op., at 1).

Here, by contrast, the Court has ambushed Congress with an utterly unprecedented (and thus unforeseeable) maneuver. Congressional silence, "while permitting an inference that Congress intended to apply *ordinary* background" principles, "cannot show that it intended to apply an unusual modification of those rules." *Meyer* v. *Holley*, 537 U. S. 280, 286 (2003).[2] Because there is no plausible

––––––––––

[2] The Court concedes that "Congress legislates against the backdrop of existing law," but protests that "[a]t the time of AEDPA's enactment, multiple decisions of this Court applied the miscarriage of justice exception to overcome various threshold barriers to relief." *Ante,* at 14, n. 3. That is right, of course, but only at an uninformative level of generality; the relevant inquiry is, to *which* barriers had we applied the exception? Whistling past the graveyard, the Court refuses to engage

basis for inferring that Congress intended or could have anticipated this exception, its adoption here amounts to a pure judicial override of the statute Congress enacted. "It is wrong for us to reshape" AEDPA "on the very lathe of judge-made habeas jurisprudence it was designed to repair." *Stewart* v. *Martinez-Villareal*, 523 U. S. 637, 647 (1998) (SCALIA, J., dissenting).

*      *      *

"It would be marvellously inspiring to be able to boast that we have a criminal-justice system in which a claim of 'actual innocence' will always be heard, no matter how late it is brought forward, and no matter how much the failure to bring it forward at the proper time is the defendant's own fault." *Bousley,* 523 U. S., at 635 (SCALIA, J., dissenting). I suspect it is this vision of perfect justice through abundant procedure that impels the Court today. Of course, "we do not have such a system, and no society unwilling to devote unlimited resources to repetitive criminal litigation ever could." *Ibid.* Until today, a district court could dismiss an untimely petition without delving into the underlying facts. From now on, each time an untimely petitioner claims innocence—and how many prisoners asking to be let out of jail do not?—the district court will be obligated to expend limited judicial resources wading into the murky merits of the petitioner's innocence claim. The Court notes "that tenable actual-innocence gateway pleas are rare." *Ante,* at 2. That discouraging reality, intended as reassurance, is in truth "the condemnation of the procedure which has encouraged frivolous cases." *Brown*, 344 U. S., at 537 (Jackson, J., concurring in result).

It has now been 60 years since *Brown* v. *Allen*, in which we struck the Faustian bargain that traded the simple

————————

with this question.

elegance of the common-law writ of habeas corpus for federal-court power to probe the substantive merits of state-court convictions. Even after AEDPA's pass through the Augean stables, no one in a position to observe the functioning of our byzantine federal-habeas system can believe it an efficient device for separating the truly deserving from the multitude of prisoners pressing false claims. "[F]loods of stale, frivolous and repetitious petitions inundate the docket of the lower courts and swell our own. . . . It must prejudice the occasional meritorious applicant to be buried in a flood of worthless ones." *Id.,* at 536–537.

The "inundation" that Justice Jackson lamented in 1953 "consisted of 541" federal habeas petitions filed by state prisoners. Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 143 (1970). By 1969, that number had grown to 7,359. *Ibid.* In the year ending on September 30, 2012, 15,929 such petitions were filed. Administrative Office of the United States Courts, Judicial Business of the United States Courts 3 (Sept. 30, 2012) (Table C–2). Today's decision piles yet more dead weight onto a postconviction habeas system already creaking at its rusted joints.

I respectfully dissent.