NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

AUG 13 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

MANUEL MELENDEZ,

        Petitioner-Appellant,

v.

DWIGHT NEVEN, Warden; ATTORNEY
GENERAL FOR THE STATE OF
NEVADA,

        Respondents-Appellees.

No. 21-17135

D.C. No. 2:15-cv-02076-JAD-VCF

MEMORANDUM[*]

Appeal from the United States District Court
for the District of Nevada
Jennifer A. Dorsey, District Judge, Presiding

Argued and Submitted March 6, 2024
Las Vegas, Nevada

Before:  M. SMITH, BENNETT, and COLLINS, Circuit Judges.

In 2010, Petitioner Manuel Melendez was convicted in Nevada state court of six counts of lewdness with a child under the age of 14 in violation of Nev. Rev. Stat. § 201.230.  After one of those convictions was reversed on appeal, Melendez was resentenced on the remaining counts to five concurrent life sentences, with eligibility for parole after 10 years.  After unsuccessfully seeking state post-conviction relief, Melendez sought federal habeas corpus relief.  All relief was

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

ultimately denied by the district court. We granted a certificate of appealability, which we construe to cover the following questions: (1) whether the district court properly rejected Melendez's contentions that his "actual innocence" excuses his procedural defaults, including the untimeliness of some of his claims; and (2) whether the district court properly denied Melendez leave to file a third amended federal habeas petition. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253.

The Supreme Court has held that a state prisoner seeking federal habeas relief may be able to overcome various procedural defaults by making a sufficient showing of "actual innocence," *House v. Bell*, 547 U.S. 518, 536–38 (2006) (citing *Schlup v. Delo*, 513 U.S. 298 (1995)), and the Court has similarly held that such a showing may excuse a failure to comply with the federal statute of limitations governing habeas petitions, *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). The *Schlup* "actual innocence" standard requires the petitioner to "establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536–37 (quoting *Schlup*, 513 U.S. at 327). The required new evidence means "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id*. at 537 (quoting *Schlup*, 513 U.S. at 324). However, in determining whether the

2

overall actual-innocence standard has been met, a federal habeas court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* at 538 (citations and internal quotation marks omitted). The *Schlup* standard "is demanding and permits review only in the extraordinary case." *Id.* (citations and internal quotation marks omitted). We conclude that Melendez has failed to satisfy this high standard.

The alleged victim in each of Melendez's five counts of conviction was his step-granddaughter, A.C. At trial, the State's case against Melendez largely hinged on the testimony of his ex-wife, Margarita, who claimed to have seen him inappropriately touching A.C. in their home at some point during November 2006 and suspected him of having engaged in similar abuse on other occasions. Melendez's new evidence includes (1) documentation of Margarita's eviction and restraining order proceedings that, together, undermine her timeline of events; (2) testimony from A.C. stating that Melendez never touched her inappropriately; and (3) testimony from various individuals, including several of Margarita's family members, stating that she is a liar who has falsely accused others in the past and, in their view, manipulated A.C. to exact revenge on Melendez.

Melendez's documentary evidence strongly indicates that Margarita erred in certain aspects of her testimony as to the timeframe when the abuse occurred.

Margarita testified that the abuse began in October or November 2006 at a mobile home in which she and Melendez were living, with the one incident she directly observed (the "living room incident") occurring in or after November 2006. But Melendez has now produced documents showing that Margarita had in fact been evicted from the mobile home prior to November 2006. Margarita also testified that the living room incident occurred after a hospital stay that had ended at the beginning of October, which raises the possibility that the living room incident occurred in October. However, Melendez has presented new evidence that casts doubt on an October timeline as well. Specifically, Melendez has produced documents from restraining order proceedings that Margarita initiated against him in October 2006. These documents state that Margarita and Melendez had been separated since October 1, 2006, and that Melendez was then living with his cousin. Moreover, although these documents mention Margarita's claims that Melendez threatened to kill her and fired gunshots into her pastor's house, they make no reference to sexual abuse.

Contrary to what Melendez contends, his new evidence does not render the substance of Margarita's allegations "impossible." As the district court noted, Melendez's new evidence did not foreclose the possibility that the living room incident occurred in October 2006. In particular, there is evidence in the record that, even after their separation, Melendez and Margarita continued to have contact

4

with one another, and a reasonable juror could infer that such opportunities for contact occurred at other times during the separation. And even if Margarita's testimony about timing was wrong, that does not establish that the charged incidents never occurred. Though the living room incident was the only act of sexual abuse that Margarita directly witnessed, Melendez was convicted of having abused A.C. on other occasions as well. Margarita's claims about the timing of these other occasions were less consistent, leaving open the possibility that they occurred prior to October 2006. Margarita acknowledged in her testimony that she had expressed uncertainty about the relevant dates.

Furthermore, there is additional evidence in the record that corroborates Margarita's description of the living room incident. Kalani Hoo, who represented Melendez for a time during the lead-up to trial, was called by the State as a witness in Melendez's October 2013 post-conviction state evidentiary hearing. Hoo testified that Melendez took a polygraph test in preparation for his defense, but that the results indicated he was "deceptive." Hoo also testified that one of his investigators told him about an interaction with Melendez that led Hoo "to believe that maybe one or more of the instances [of abuse] were not fabricated." When asked whether this meant that either Margarita or A.C. "was telling the truth on some of these things," Hoo stated "I don't know. I purposely don't interject myself in that inquiry because I don't want to know, . . . so that's why I have my

5

investigator as a buffer to do that." When asked again later if "[Melendez] didn't do what he was accused of [doing]," Hoo provided the following testimony, which a reasonable factfinder could readily conclude refers to the living room incident:

> I was informed of a discussion [Melendez] had with my investigator that didn't—it didn't challenge—One of the accusations was, Margarita came out, saw the girl on all fours watching television, and being stark naked, a bowl of candy, or bowl of something, in front of her, and he had his face in her lower region, that was one of the accusations, and my understanding was from my investigator he denied that happened and said, no, she was wearing a dress, just no underwear, and denied he was in physical contact with her, but was near that area. So my struggle with that was, I think ethically I was challenged as to whether or not I could go after the girl, or challenge the girl's assertions, when I had some inference that it may not—what she was saying may have been true, so I didn't want to—

After prompting, Hoo stated "[t]hat's why a lot of these conversations I didn't have directly with him, so I could maintain that distance, but I had to know, and that's why it sort of shaped the way in which we presented a defense." When asked further if Melendez had told Hoo that "[Melendez] committed anything in terms of this," Hoo responded "[h]e didn't tell me directly, no, he did not." And when asked if he agreed that there was "never an admission on the part of [Melendez] as to conducting any of the allegations," Hoo said "[s]ure."

Viewing all of this evidence as a whole, Melendez has failed to show by a preponderance that, in light of the new evidence, no reasonable juror would have convicted. The timing of the charged incidents is not an element in the crime of

6

which Melendez was convicted, and Margarita's errors as to the timeline are not inconsistent with a finding that the incidents nonetheless happened.

The remainder of Melendez's new evidence, which largely bears on the credibility of key trial testimony, does not alter our conclusion that the *Schlup* standard has not been met. Although Melendez has presented evidence that A.C. now claims not to remember Melendez's abuse, this does not necessarily refute anything that she said during the initial trial. A.C.'s testimony at trial was understandably somewhat equivocal, given that she was only three years old at the time of the investigation, and jurors could reasonably conclude that A.C.'s current recollection (or lack thereof) is not decisive. Although Melendez has presented additional evidence that could lead reasonable jurors to decide to discount Margarita's testimony, it is not so overwhelming that every reasonable juror would have had reasonable doubt as to the veracity of her core contentions. Moreover, a reasonable juror could credit rehabilitation evidence from Margarita's daughter, Adriana, who corroborated Margarita's claims about having heard A.C. reference the abuse. And, conversely, a reasonable juror could instead decide to discount Melendez's credibility, given that he took the stand to deny that the alleged abuse occurred.

Taking into account all of the evidence that *Schlup* instructs us to consider, we hold that Melendez has not carried his burden to show by a preponderance that,

7

in light of the new evidence, no reasonable juror would convict. Consequently, Melendez failed to excuse any bar presented by the statute of limitations or by any other procedural defaults. In light of these conclusions, we further hold that the district court did not abuse its discretion in denying leave to amend Melendez's habeas petition.

**AFFIRMED.**